

| | | |
|---|---|---|
| RANDY D. FIRKIN, | ) | |
| | ) | |
| Plaintiff, | ) | Case. No. 11 C 578 |
| v. | ) | |
| | ) | Magistrate Judge |
| Michael J. Astrue, | ) | Arlander Keys |
| Commissioner of Social | ) | |
| Security | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

### Background & Procedural History

On January 22, 2003, plaintiff Randy Firkin was injured on the job while lifting heavy boxes. He applied for Disability Insurance Benefits on September 1, 2005, alleging disability as of the date of his work injury, due to lower back pain and degenerative disc disease. That application was denied initially and on appeal. Mr. Firkin requested and was granted a hearing before an administrative law judge, who awarded him a closed period of benefits from January 2003 through December 31, 2005, apparently after Mr. Firkin stipulated that he had improved medically to the point that he was no longer disabled as of that date (December 31, 2005).

Mr. Firkin filed another application for Disability Insurance Benefits on January 31, 2007, seeking benefits from the original date of onset forward, and alleging the same impairments. That application, like the first, was denied

initially and on reconsideration, and Mr. Firkin again requested a hearing before an administrative law judge. His case was assigned to ALJ Shirley M. Michaelson, who held the requested hearing on April 16, 2009.

At the outset of the hearing, the ALJ advised Mr. Firkin, who appeared with the same counsel who had represented him in the earlier hearing, that her job was to consider whether he was disabled during the period from January 1, 2006, through the date of the hearing; his attorney agreed. Record at 12-13. Thus, she advised, the point of the hearing was to determine what exactly was going on with Mr. Firkin, medically speaking, during that period. Record at 13. To that end, the ALJ first heard from Mr. Firkin.

Mr. Firkin testified that he lives with his girlfriend in a 2-bedroom third floor walk-up apartment. Record at 27-28. He testified that he has grown children who come by to help with grocery shopping; he testified that his girlfriend prepares his meals, does the laundry, drives him where he needs to be. Record at 29-30. He testified that he lost his license two years prior to the hearing because of a DUI. Record at 19. He testified that he is able to shower, tie his shoes, get dressed. Record at 30-31. He testified that, on an easy day, he watches TV; on a more active day he walks to a little store down the street, pays bills. Record at 31. On a very bad day, he testified, he lays

2

down.  Record at 31.  He testified that he is able to walk to the store about once a week.  Record at 32.  He testified that it is hard for him to sit and stand for any length of time; he testified that he usually lays on the couch to watch tv, that he sometimes sits in a recliner and that he sleeps flat on his back in bed.  Record at 33.  He testified that he usually goes to bed around 10:00 p.m., takes 6 Tylenol PM and then still wakes up about 2:00 a.m.; he testified that he is sometimes able to go back to sleep.  Record at 33-34.

At the hearing, there was a great deal of discussion about what Mr. Firkin had and had not done since the end of the closed period of disability (i.e., from 1/6/06 forward).  And there was some confusion about whether Mr. Firkin had pursued pain management or any other treatment options in 2007 or 2008.  The ALJ noted at the hearing that the last record she had for pain management was from August 2007, and both Mr. Firkin and his attorney seemed to think that was right.  Record at 43-44.  He testified that he stopped going to pain management because of the "workers' comp struggle."  Record at 44.  He testified that he only seeks treatment if someone is going to pay for it, and that when workers' compensation declined to pay, he stopped going.  Record at 45.  He testified that he is pursuing a workers' compensation claim through another lawyer and that, at the time, he was receiving $395 per week from that; he testified that he

had been receiving that amount, on and off, since "shortly after I got hurt." Record at 46.

When asked about his pain, he testified that it had "been going on almost a year now. Maybe a little longer. It's just kind of getting worse and worse." Record at 48. He testified that he had seen Dr. Lorenz, the doctor who performed the back surgery in 2005, in September 2007 and September 2008; the ALJ noted that the medical records ended on October 2008. Record at 48-49. She noted that the record "goes cold in 10/08"; she told Mr. Firkin that she saw "huge gaps of treatment, no prescription pain medication for eight months, and no office visits for five . . . ." Record at 50. She told him that, in her view, this was "a pain case with limited treatment, and the x-rays are sort of okay." Record at 51. Her comments certainly suggest that, even at the hearing, she was skeptical about his odds of prevailing.

The ALJ also heard testimony from Pamela Tucker, a Vocational Expert who had reviewed Mr. Firkin's work record. She testified that Mr. Firkin's past work was characterized as a carpenter, classified as skilled and medium per the DOT, but as heavy as performed. Record at 52. After noting that Mr. Firkin would be limited to sedentary work and that he had a high school diploma and no transferable skills, the ALJ asked the VE whether a restriction on climbing, crouching and stooping would affect the availability of jobs within the sedentary pool; she testified

that if he were unable to do *any* climbing, crouching or stooping, he would be precluded from all sedentary work. Record at 52-53. She testified, however, that if he could occasionally climb, stoop or crouch, there would be work he could do at the unskilled sedentary level. Record at 53. The ALJ then asked whether those jobs would still be available if, along with the "occasional posturals," he also needed to stand or change positions at least every hour and stand at least five minutes of every hour; the VE testified that he could still do those jobs. Record at 53. The ALJ then asked whether those jobs would still be available if he were off task 15 minutes per hour, and the VE testified that all jobs would be eliminated with that added criteria. Record at 54. Similarly, the VE testified, all work would be precluded if he were going to be absent from work three times a month. Record at 54. The ALJ asked the VE whether her testimony was consistent with the DOT, and she testified that it was; she also testified that her opinions concerning sitting and standing were based upon the characterizations of work as light or sedentary and based upon her experience in terms of how the jobs were performed. Record at 54, 58.

Finally, the ALJ heard from a Medical Expert – Dr. Walter Miller, who had been expected to testify live, but who instead provided written interrogatories. After a cursory review of Dr. Miller's submission, the ALJ indicated that, in her view, it was

"junk" and that she would not be relying upon it at all; she advised that she was going to give his assessment "no weight." Record at 54-55.

At the end of the hearing, the ALJ agreed to hold the record open to give Mr. Firkin and his attorney time to supplement the record with any additional medical records. The ALJ was very clear that she thought the lack of treatment records and the very large gaps in treatment posed a problem for Mr. Firkin's case; she was also very clear that she wanted to give Mr. Firkin every opportunity to ensure that he presented everything to her for consideration.

During that period, Mr. Firkin and his attorney did submit records to the ALJ. The ALJ noted that Mr. Firkin and his attorney did produce some additional records after the hearing, but she characterized them as being "largely cumulative in nature" and not offering "much additional support to the claimant's allegations." Record at 133. Although the administrative record in this case is quite thick, the bulk of the medical records come from the period for which Mr. Firkin has already been awarded benefits; there is some, but not much, medical evidence after December 31, 2005.

To backtrack slightly, the record shows that, on December 27, 2005, Mr. Firkin saw Dr. Krishna Parameswar at the APAC Group Centers for Pain Management; at that time, he complained of

6

shooting pain down the bilateral lower extremities into his feet. Record at 833. He reported to Dr. Parameswar his history, and indicated that he had physical therapy after his 2005 surgery and, more recently, epidural steroid injections, neither of which relieved his pain. Record at 833. Mr. Firkin reported that his sitting and standing were limited (60 minutes on the former and 15-20 minutes on the latter), as was his walking ability (1-2 blocks). *Id.* Mr. Firkin reported that, with Norco and Sonata, his pain level rated 1-2 out of 10. *Id.* Mr. Firkin also reported that he smoked a pack of cigarettes per day and drank a 12-pack of beer per week. *Id.* On examination, straight leg raise in sitting position was negative bilaterally, blood pressure, pulse, respiration and body temperature were all normal. Record at 834. Dr. Parameswar also noted that a post-operative MRI was "not significant at this time." *Id.* Dr. Parameswar recommended starting several medications (Kadian, Lyrica, Celebrex, Flexeril), discontinuing the use of Norco and continuing the use of Sonata at bedtime. *Id.* Dr. Parameswar also recommended that Mr. Firkin see a pain psychologist "to hopefully give the patient distraction techniques for his pain and smoking." *Id.*

Mr. Firkin returned to see Dr. Parameswar on January 31, 2006; at that time, he complained of continued stiffness in his low back and shooting pains in his bilateral lower extremities. Record at 828. On physical exam, Dr. Parameswar noted that Mr.

Firkin had "a very stiff antalgic gait" and that he walked in a "'waddling' position"; he indicated that he was not using an assistive device, but that he had a cane in his car. Record at 828. Again, his straight leg raise was negative in the sitting position in the bilateral lower extremities. *Id.* At the end of the visit, Dr. Parameswar recommended that Mr. Firkin increase his Lyrica dosage (from 50 mg/day to 100 mg/day). *Id.*

Mr. Firkin returned to Dr. Parameswar on March 28, 2006, complaining of low back pain; at that time, he rated his pain at a 2 out of 10. Record at 827. He described the pain as "constant, sharp. Mainly in the right lower extremity to the foot with numbness in the bilateral buttocks." Record at 825. Dr. Parameswar recommended increasing his dosage of Kadian and Lyrica, and continuing his dosage of Celebrex and Sonata. *Id.* He called Hinsdale Orthopaedic on May 31, 2006, reporting that Workers' Comp had "cut him off" and asking for a refill of Norco, which he said he intended to pay for himself. Record at 852. His request was denied; Dr. Lorenz instructed him to go through the pain clinic for his prescriptions. *Id.*

Mr. Firkin next saw Dr. Parameswar on August 16, 2006, reporting no new symptoms but continued constant mid-to-low back numbness and pain. Record at 822. At the time of the visit, he rated his pain at a 3 out of 10. Record at 824. Mr. Firkin reported that, since his last visit in March, his Workers'

Compensation insurer declined to cover his prescriptions, so he had been taking only advil for his pain. Record at 822. Mr. Firkin reported that his symptoms "vary with the amount of activity that he performs and that sitting, standing and walking can be either severely or moderately painful depending on how long he does each one of these activities." Record at 822. Dr. Parameswar noted that, on physical examination, Mr. Firkin's "gait, toe and heel walking are unremarkable"; straight leg raise in the sitting position was negative bilaterally. Record at 822. Dr. Parameswar recommended that Mr. Firkin restart his medications – namely, Kadian, Lyrica, Sonata – and continue taking advil as needed. Record at 822.

On September 27, 2006, Mr. Firkin returned to APAC Group Centers for Pain Management, where he saw Dr. Parameswar's partner, Dr. Raja Jamil. Record at 820. At that time, he rated his pain at a 6-7 out of 10, though it appears that his chief complaint related to his shoulder, not to his back (he reported that his back symptoms were "essentially unchanged"). Record at 820-821. Dr. Jamil noted that he was unable to treat the shoulder injury because it was "not under the allowed conditions for his Workers' Comp claim"; he recommended that Mr. Firkin see his primary care physician or go to urgent care to have his shoulder evaluated. Record at 820. With respect to Mr. Firkin's

back, Dr. Jamil recommended increasing the dosage of Lyrica to address his "radicular symptoms." *Id.*

Mr. Firkin saw Dr. Parameswar again on December 6, 2006, having missed his last three appointments due to car problems; Dr. Parameswar noted that, because of the time lag, Mr. Firkin had been out of Kadian and Lyrica "for the last couple of months." Record at 819. Despite this, at the time of his appointment, Mr. Firkin rated his pain at a zero out of 10. *Id.* Mr. Firkin reported that, without his medication, he had a severe increase in sharpness of pain down his right anterior thigh and anterior tibial region. *Id.* He reported that he had had "no new changes in his pain or new pain symptoms, just exacerbation of his previous pain." *Id.* Dr. Parameswar recommended that Mr. Firkin continue taking his prescribed medication – namely, Kadian, Sonata, and Lyrica – and that he follow up in one month. *Id.*

Mr. Firkin returned to APAC on January 10, 2007; at that time, he reported that his pain was relatively well controlled with medication. Record at 818. On examination, he had "very limited range of motion in his back" and straight leg raise was positive. *Id.* He returned on February 21, 2007, complaining that his pain had gotten worse; he complained of burning and stabbing pain into both of his legs. Dr. Jamil noted that Mr. Firkin had not gotten a prescription for Lyrica and had been off

10

that medication in the weeks prior to his appointment; he recommended resuming that medication to address the increased pain. Record at 817. He saw Dr. Jamil again on March 14, 2007, reporting that he had seen some improvement in his symptoms but that he was still having "persistent burning and tingling in the left leg and into the foot"; he reported that he was no longer experiencing symptoms in his right leg. Record at 816. Dr. Jamil recommended that Mr. Firkin have an MRI and return with the results. *Id.*

On March 23, 2007, Mr. Firkin had an MRI in an attempt to address his low back pain, which was radiating into his legs. Record at 836. The MRI revealed "[m]ild facet hypertrophic changes and disc bulging at the levels of L2 through L5 resulting in narrowing of the left side of L2-L3 and slight bilateral neural foraminal narrowing at L3-L4 levels." Record at 837. "Otherwise, the examination [was] unremarkable." *Id.*

On April 18, 2007, he returned to Dr. Jamil, complaining of "worsening of his back pain and radicular symptoms." Record at 815. He reported that "when he gets the pain it grips him; he feels intense weakness and he has to fall. This has been happening more frequently." *Id.* After examining Mr. Firkin, Dr. Jamil noted that his physical condition had not changed; Dr. Jamil also noted that the MRI report showed "some minimal degenerative changes with no significant central or foraminal

stenosis noted." *Id.* The MRI showed no evidence of any disc herniations or foraminal stenosis. *Id.* Dr. Jamil added naproxen to Mr. Firkin's medication regimen and recommended that he return for follow up in two weeks. *Id.*

On May 3, 2007, Mr. Firkin went to APAC for a lumbar epidural steroid injection, but because of his COPD symptoms, the procedure was postponed. Record at 814. On May 16, 2007, he returned to Dr. Jamil, reporting that his symptoms were "a little better today"; he rated his pain at 3/10. Record at 813. He was scheduled to receive an epidural steroid injection, but was unable to go forward with that because of an upper respiratory infection. Dr. Jamil recommended rescheduling that procedure. Dr. Jamil also recommended continuing with his current medications (Kadian, Flexeril, Lyricam Skelaxin and Cymbalta; Dr. Jamil also recommended that Mr. Firkin begin taking naproxen and using Lidoderm patches. Record at 813.

On May 24, 2007. Mr. Firkin was back at APAC for an epidural steroid injection. Record at 831. He tolerated the procedure well and he was discharged home in good condition, with instructions to follow up in the clinic in two weeks for evaluation of his response to the procedure. Record at 829-831.

On June 18, 2007, he returned to APAC; at that time, he rated his pain at 4/10 and indicated that his recent epidural steroid injection had provided no relief. He was taking Kadian,

Flexeril, Lyrica, Skeflaxin and Cymbalta. Record at 811. Dr. Jamil, who saw Mr. Firkin that day, recommended increasing his Cymbalta dosage (from 30 mg/day to 60 mg/day), but otherwise noted that "[b]ecause he is having increased pain with little to no relief, I am not sure if there is anything more I can suggest. I am going to refer him to see my partner Dr. Chang to evaluate for a possible spinal cord stimulator placement. Dr. Chang may also have some other ideas." Record at 811.

On July 9, 2007, Mr. Firkin returned to APAC to see Dr. Chang; at that time, he complained of continued pain. Given that the interventions tried to date had "minimal short-term response," Dr. Chang recommended trying a spinal cord stimulator implantation; the trial was dependent on insurance approval and on Mr. Firkin being cleared from the pain health psychologist. Record at 810. He returned for a follow up on August 15, 2007, and it was noted that Mr. Firkin was still awaiting insurance approval for the spinal cord stimulator. Record at 809. There do not appear to be any further records from APAC.

In September 2007, Mr. Firkin went to Hinsdale Orthopaedic, complaining of pain rated at a 6 out of 10. Record at 855. In a report dated September 24, 2007, Dr. Lorenz indicated that Mr. Firkin's x-ray "demonstrates an excellent fusion from L2 to L1." Record at 858.

On December 19, 2007, Mr. Firkin called Dr. Lorenz's office to advise that Worker's Comp would not allow him to have a CT scan or "to access the pain clinic at this time." Record at 850. The office instructed him to follow up with his primary care physician. *Id.*

On September 8, 2008, Mr. Firkin was seen at Hinsdale Orthopaedic Associates; at that time, he rated his pain at a 6/10. Record at 847. He noted that his pain averaged a level of 6/10, with days as bad as a 10/10. *Id.* He returned to Hinsdale Orthopaedic Associates on October 6, 2008; he rated his pain at an 8/10, noting that, on average, he experienced pain at 5/10, with his best days being a 6/10 and his worst days being a 10/10. Record at 845. Progress notes from the October 6, 2008 visit show that his case had been "stagnant"; he had not been approved for any additional therapy or medication but continued to suffer pain, including a new pain in his right lower extremity caused by limping. Record at 849. Dr. Lorenz, at Hinsdale Orthopaedic, examined Mr. Firkin and noted that, although his shoulder was tender, he actually had reasonably good range of motion; he diagnosed him with "patellofemoral syndrome, right knee and bicipital tendinitis with subacromial bursitis on the right shoulder" and noted that his knee and shoulder issues "appear to be related to the patient's ambulation with the cane." Record at 849. With regard to Mr. Firkin's back, Dr. Lorenz noted that his

14

x-rays showed the fusion "looks excellent and is solid." *Id.*, *see also* Record at 857. He noted that "the hardware is in excellent position. Lordosis is maintained and there is little to no degenerative changes at the level above the fusion." Record at 849, 857. Dr. Lorenz noted that the plan was to get Mr. Firkin back into some kind of physical therapy; he also gave him some Darvocet for pain and told him to return as needed. *Id.* It is not clear that Mr. Firkin ever followed through with that plan; indeed, the record does not include any medical records after this date.

The ALJ issued her decision on September 15, 2009, denying Mr. Firkin's claim for DIB. She determined that Mr. Firkin met the insured status requirements of the Social Security Act through March 31, 2011 and that he had not engaged in substantial gainful activity since January 1, 2003. Record at 130. The ALJ determined that Mr. Firkin suffered from chronic low back pain, status post lumbar fusion, but did not have an impairment or combination of impairments that met or equaled a listed impairment; she also determined that he had the Residual Functional Capacity to perform sedentary work involving occasional balancing, stopping, kneeling, crouching, crawling and climbing of ramps and stairs, but could never climb ladders, ropes or scaffolds. Record at 132. Thus, she determined, he was unable to perform his past relevant work as a carpenter, but

could perform other jobs that exist in significant numbers in the national economy. Record at 139. Therefore, the ALJ determined, he was not disabled within the meaning of the Act, and was not entitled to benefits. Record at 140-141.

After the Appeals Council denied review, Mr. Firkin filed a lawsuit in this Court, seeking review of the Social Security Administration's final agency decision. The parties consented to proceed before a United States Magistrate Judge, and the case was reassigned to this Court on April 22, 2011. The case is now before the Court on cross motions for summary judgment: Mr. Firkin asks the Court to reverse the Commissioner's decision denying him benefits, or to remand the matter for further proceedings; the Commissioner seeks summary judgment affirming the agency's decision.

## **DISCUSSION**

### Applicable Law

An individual claiming a need for DBI or SSI must prove that he has a disability under the terms of the SSA. In determining whether an individual is eligible for benefits, the social security regulations require a sequential five step analysis. First, the ALJ must determine if the claimant is currently employed; second, a determination must be made as to whether the claimant has a severe impairment; third, the ALJ must determine if the impairment meets or equals one of the impairments listed

by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1; fourth, the ALJ must determine the claimant's RFC, and must evaluate whether the claimant can perform his past relevant work; and fifth, the ALJ must decide whether the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). At steps one through four, the claimant bears the burden of proof; at step five, the burden shifts to the Commissioner. *Id.*

A district court reviewing an ALJ's decision must affirm if the decision is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In reviewing an ALJ's decision for substantial evidence, the Court may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990).

An ALJ must articulate her analysis by building an accurate and logical bridge from the evidence to her conclusions, so that the Court may afford the claimant meaningful review of the SSA's ultimate findings. *Steele*, 290 F.3d at 941. It is not enough that the record contains evidence to support the ALJ's decision; if the ALJ does not rationally articulate the grounds for that decision, or if the decision is not sufficiently articulated, so as to prevent meaningful review, the Court must remand. *Id.*

## Analysis of Mr. Firkin's Arguments

Mr. Firkin argues that the ALJ's decision should be reversed or remanded because she failed properly to consider whether he met or equaled Listing 1.04; failed properly to weigh and consider all of the evidence of record in making her RFC determination; failed to make a proper credibility determination; and made an erroneous determination at Step 5.

At the outset, the Court notes that, according to the record evidence, Mr. Firkin, when he was awarded the closed period of disability from January 22, 2003 through December 31, 2005, stipulated that he was no longer disabled as of that end date. At the hearing on April 16, 2009, the primary issue was whether something had changed after that date to suggest that Mr. Firkin was, in fact, disabled. In his briefs before the Court, Mr. Firkin has not really focused on this issue, opting instead to emphasize medical records and evidence dated prior to that cutoff

date.  In fact, he gives the issue just one sentence: "Finally,
the ALJ improperly maintained that the Plaintiff 'voluntarily
stipulated to the fact that, notwithstanding the FCE, that his
condition had improved and he was no longer disabled as of
December 31, 2005'; despite medical records and Plaintiff's
testimony to the contrary."  Memorandum in Support of Motion for
Summary Judgment, p. 23.  In fact, Mr. Firkin was awarded a
closed period of disability for the period prior to December 31,
2005, and the record does, indeed, indicate that he stipulated to
the improvement noted.  It may well be some sort of horrific
administrative error, but he does not argue that point; and if it
was an error, it was not ALJ Michaelson's error, but an error on
the part of the ALJ who made the determination on the closed
period of disability – Mr. Firkin has not challenged that
determination.  He does not explain this; nor does he explain
what changed after December 31, 2005.  This is curious.

Mr. Firkin argues that the ALJ's decision should be reversed
or remanded because she: (1) failed to evaluate properly Mr.
Firkin's impairments under Listing 1.04; (2) made an erroneous
RFC determination; (3) failed to make a proper credibility
determination; and (4) made an erroneous Step 5 determination.

    1.   The ALJ's Evaluation of Listing 1.04

Mr. Firkin first argues that the ALJ erred in determining
that his impairments did not meet or equal Listing 1.04.  This

listing deals with disorders of the spine, including "herniated

nucleus pulposus, spinal arachnoiditis, spinal stenosis,

osteoarthritis, degenerative disc disease, facet arthritis,

vertebral fracture), resulting in compromise of a nerve root

(including the cauda equina) or the spinal cord." To meet the

listing, there must also be:

> (A) Evidence of nerve root compression
> characterized by neuro-anatomic distribution of pain,
> limitation of motion of the spine, motor loss (atrophy
> with associated muscle weakness or muscle weakness)
> accompanied by sensory or reflex loss and, if there is
> involvement of the lower back, positive straight-leg
> raising test (sitting and supine);
>
> (B) Spinal arachnoiditis, confirmed by an
> operative note or pathology report of tissue biopsy, or
> by appropriate medically acceptable imaging, manifested
> by severe burning or painful dysesthesia, resulting in
> the need for changes in position or posture more than
> once every 2 hours; or
>
> (C) Lumbar spinal stenosis resulting in
> pseudoclaudication, established by findings on
> appropriate medically acceptable imaging, manifested by
> chronic nonradicular pain and weakness, and resulting
> in inability to ambulate effectively, as defined in
> 1.00B2b.

"In considering whether a claimant's condition meets or

equals a listed impairment, an ALJ must discuss the listing by

name and offer more than a perfunctory analysis of the listing."

Hanson v. Astrue (citing *Barnett v. Barnhart,* 381 F.3d 664,

668-69 (7th Cir. 2004)(finding the ALJ's "two-sentence

consideration of the Listing of Impairments [was] inadequate and

warrants remand"). In particular, the ALJ is required to evaluate

any evidence of the required criteria that is favorable to the claimant. *Ribaudo v. Barnhart,* 458 F.3d 580, 584 (7th Cir. 2006) ("[the ALJ's] failure here to evaluate any of the evidence that potentially supported [claimant's] claim does not provide much assurance that he adequately considered [the] case"); *Brindisi v. Barnhart,* 315 F.3d 783, 786 (7th Cir.2003) (remanding where ALJ failed to mention the strongest piece of evidence supporting an impairment). In addition, "[w]hether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue." *Barnett,* 381 F.3d at 670. Here, the ALJ determined that Mr. Firkin suffered from low back pain, status post lumbar fusion, but that his impairments did not meet or medically equal a listed impairment. In particular, the ALJ determined:

> Although the claimant has a "severe" impairment, his chronic back pain does not meet the criteria of any listed impairments described in Appendix 1 of the Regulations (20 CFR, Subpart P, Appendix 1). No treating or examining physician has identified findings equivalent in severity to the criteria of any listed impairment, and in particular Listing 1.04 (disorders of the spine), nor does the evidence show medical findings that are the same or equivalent to those of any listed impairment of the Listings of Impairments.

Record at 131-132. This is precisely the type of cursory analysis that the Seventh Circuit has criticized as perfunctory. And it would be especially problematic because there is some evidence to suggest that Mr. Firkin may have had "nerve root compression characterized by neuro-anatomic distribution of pain,

limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and . . . positive straight-leg raising test . . ."; there is also evidence to suggest that Mr. Firkin may have "lumbar spinal stenosis . . . manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b." But, significantly, that evidence all dates from before December 31, 2005 – the end date of his closed period of disability.

Even in his reply brief, Mr. Firkin focuses on medical evidence dating from the period before his stipulated improvement. Thus, even if he has shown that he met the listing requirements prior to December 31, 2005, there is simply no evidence that he met the listing requirements after that date. Mr. Firkin persistently refuses to acknowledge that stipulation. But his refusal does not change the fact that it occurred, that his attorney agreed before the ALJ that it occurred, and that it had significant consequences, not the least of which is that, to prove disability after December 31, 2005, he has to show that things changed and deteriorated after that date. He did not do so before the ALJ, and he has not done so here.

2.  The ALJ's RFC Determination

Mr. Firkin next argues that the ALJ's RFC determination was wrong and not supported by the evidence of record.  In particular, Mr. Firkin argues that the ALJ's RFC was inconsistent with the findings contained in the Functional Capacity Evaluation performed on December 19, 2005.  But the ALJ considered the FCE and rejected it for two reasons.  First, she noted that, even on its face, the FCE questioned whether the RFC conclusions could be relied upon, given Mr. Firkin's apparent decision to put forth less than maximal effort.  Record at 138.  Second, the ALJ noted that, after the FCE was performed, Mr. Firkin stipulated that his condition had improved and that he was no longer disabled as of December 31, 2005.  Record at 138.  This is really the heart of his problem – if the ALJ is right about the stipulation, Mr. Firkin is stuck.  If, however, the ALJ is just wrong about the stipulation, that changes everything.

Unfortunately, the Court does not have before it any record of that first hearing or of the decision of that first ALJ, so it is unable to verify that Mr. Firkin actually did stipulate to medical improvement or whether the closed period of disability was entered for some other reason.  It's possible that the medical improvement assumption is stemming from a note from Dr. Lorenz that he had achieved MMI (maximum medical improvement) – a designation that likely suggests a stagnation of improvement,

23

rather than a full recovery from the symptoms and impairments.
On the record before it, the Court simply cannot assess that
finding. But, whatever the reason, the first ALJ awarded a
closed period of disability and, significantly, it does not
appear that Mr. Firkin ever challenged that award. What is clear
here, however, is that Mr. Firkin offered no evidence to suggest
that his condition worsened after December 31, 2005.
Accordingly, the Court cannot say that the ALJ's 2009 decision
was flawed or unsupported.

### 3. The ALJ's Credibility Determination

Next, Mr. Firkin challenges the ALJ's determination that his
allegations concerning his inability to do even sedentary work
were not fully credible. After reviewing the records and
listening to Mr. Firkin's testimony, the ALJ determined that Mr.
Firkin's activities and his behavior with respect to treatment
and medication undermined his claims of disabling pain. Record
at 138. In particular, the ALJ found it significant that Mr.
Firkin lived in a third floor walk up, without an elevator, for
the past five years; she also found it significant that, although
he had some money coming in from his Workers' Compensation claim,
he chose to rely upon over-the-counter pain medication and sought
no formal treatment or even pain management. Mr. Firkin's
testimony concerning his pain was not just inconsistent with his
behavior and the objective medical evidence; what he told the ALJ

at the hearing was inconsistent with what he reported to his doctors at the time of his visits. These are valid reasons for discounting a claimant's credibility, and the Court will not second guess them.

4.    The ALJ's Step 5 Determination

Finally, Mr. Firkin challenges the ALJ's determination, at step 5, that, although he was precluded from performing his past relevant work, he could nonetheless perform jobs that existed in substantial numbers in the national economy. First on this score, Mr. Firkin argues that the ALJ was wrong to disregard the ME's interrogatories and that she had an obligation to hold a supplemental hearing or otherwise obtain additional information from the ME. This argument is entirely inconsistent with what occurred at the hearing. At the hearing, the ALJ and Mr. Firkin's attorney discussed the ME's interrogatories and his role in the case:

ALJ: I'm looking at my own assessment of this claim. I'm proceeding as if we don't have Dr. Miller's interrogatory, because quite frankly I question – I have no clue what he saw, and so I therefore can't give it a lot of weight. That's not what I'm relying on. What I'm relying on is my assessment of both the objective records before 1/1/06 as well as the objective records since 1/1/06. I don't see a lot of treatment in '06 or '07, or even in '08 until last fall, and then I don't know where

that's gone. You know it's only been five months. I'm doing that without benefit of an ME opinion. Not every judge has an ME in every case. We can sort of figure out some of this on our own.

Record at 22.

Later in the hearing, after making a quick review of Dr. Miller's report, the ALJ noted that his submission was "absolutely junk." Record at 54. She noted that "he obviously did it in some amount of haste, because he says sedentary work. Then goes and says, however, he can stand six to eight. He can walk two to eight. I mean I don't know what the doctor was thinking." Record at 54-55. Mr. Firkin's attorney responded, "Yeah." Record at 55. The ALJ then indicated that it was "difficult for me to understand what the doctor had in mind. So I'm not going to rely on this assessment at all, you know, if you want to send him clarification questions that's one thing, but as it is, I cannot make head nor tails of it, and so I can give it no weight." Record at 55. Mr. Firkin's attorney responded: "Okay. Well I'll make my request after I complete my cross examination of Ms. Tucker. How about that? Okay. All right. Okay." *Id.*

Later, Mr. Firkin's attorney noted that there was a question of whether the ME actually had seen all of the medical records and information, and the following colloquy ensued:

> ALJ: I don't care. I'm giving his interrogatories no
> weight. I'm prepared to handle this case with no
> medical expert. You know which is my prerogative. I
> don't see what would be - what value would be added
> with medical expert testimony at this point.
>
> ATTY: I'm not being silent, because you're convincing
> me, I'm being silent, because -
>
> ALJ: You're thinking.
>
> ATTY: - I don't see any point in just saying yes, no,
> yes, no and so forth.
>
> ALJ: Well I'll see what you send me, and if what you
> send me changes the picture or raises questions that I
> would like to run by a medical expert I would certainly
> do that, but I'm not going to just do that just
> because. You know I, I - we're still where we are,
> which is chronic pain -
>
> Atty: Uh-huh.
>
> ALJ: - very limited physical findings, very little
> treatment, no pain medication, you know, in the last
> couple of years. A guy who would rather sit on his
> back than go to Oak Forest - sit on his couch than go
> to Oak Forest to get pain medication.

Record at 60. Mr. Firkin testified that he tried to go to Oak

Forest to get pain medication, but that they did not have the

medications he needed. Record at 61. The ALJ noted that she had

no record of that, and Mr. Firkin's attorney represented that he

would obtain those records and submit them to the ALJ, *id.*; they

never came.

In short, after a cursory review of the interrogatories, the

ALJ determined that the interrogatories were useless, and Mr.

Firkin's attorney agreed. The ALJ advised that she planned to

give the ME's submission no weight, and, again, Mr. Firkin's

attorney agreed. The ALJ agreed to consider, after receiving records, whether an ME was needed, and, again, Mr. Firkin's attorney agreed with that plan. No records on the relevant topic came, and so the ALJ was entirely justified in declining to bring in another ME and to simply rely on her own assessment of the medical records on file.

Mr. Firkin argues that "if the ALJ had any questions, thought any medical evidence outstanding, it was her duty to investigate the facts . . . ." Reply, pp. 15-16. Again, this argument reflects a misstatement of what occurred – the ALJ did not have any questions; but because Mr. Firkin suggested that he had sought medical attention to a degree greater than that reflected by the evidence, the ALJ held the record open to give him time to submit those records. Contrary to what he says now, he did not admit that he had pursued no treatment; he claimed that he had, but he never submitted records to bolster that claim.

Mr. Firkin also argues that the ALJ should have ordered additional x-rays and evaluations. But the x-rays in the record were fairly recent and not, in any way, ambiguous. That Mr. Firkin does not like the findings does not mean the ALJ is obliged to order new ones.

Finally, Mr. Firkin argues that the ALJ failed to consider his "whole constellation of impairments including: DDD, facet

arthritis, herniated nucleas pulposus, PF syndrome in the right knee bicipital tendonitis and subacromial bursitis of the right shoulder and COPD." Brief at 24. He then goes on to cite a slew of record pages, the majority of which precede the relevant date for purposes of this round of proceedings. Most of the medical records cited by Mr. Firkin date from 2003, 2004 and 2005. What's more, the records concerning the period beginning January 1, 2006 - the relevant period for purposes of ALJ Michaelson's 2009 decision - are not particularly helpful to Mr. Firkin. For example, one record notes that an epidural lumbar steroid injection was canceled because Mr. Firkin's COPD symptoms had flared up, with productive cough and fevers"; it was suggested that he follow up with his family care practitioner and to reschedule the injection. Record at 772. Although he rescheduled the injection, there is no record that he ever followed up with another doctor for his COPD after that flare up. He did apparently seek treatment for his COPD three years later: a "Final Report" from a pulmonary inpatient department dated March 11, 2010 notes that Mr. Firkin was experiencing wheezing and an exacerbation of his COPD symptoms. Record at 963. But it also notes that he was "feeling a little better" and that he was being treated with bronchodilators and prednisone; there is no preliminary report or any follow up treatment notes. Many people have COPD and are not considered disabled within the meaning of

the Social Security Act; to prove that he was disabled, Mr. Firkin would need to show more than simply that he had COPD or that it was exacerbated once or twice – especially when his symptoms apparently responded to treatment, when sought. This is simply not enough to establish disability and it is certainly not enough to warrant a remand or reversal of the ALJ's decision.

Much of the remaining evidence does not help Mr. Firkin, but is consistent with the ALJ's findings. For example, the April 18, 2007 record notes that "there are some minimal degenerative changes with no significant central or foraminal stenosis noted" and that "the MRI does not show any evidence of any disc herniations or foraminal stenosis." Record at 773.

To be sure, there are some records from the relevant period that support Mr. Firkin's claims. For example, in September 2006 he reported that his pain was getting worse. Record at 778. And on March 14, 2007, Dr. Jamil noted that "it appears as though he does have perhaps acute left S1 radiculopathy." Record at 774. But these would be much more persuasive without the context of the stipulation of non-disability. And these records are substantially outweighed by the myriad documents going the other way. A record from October 6, 2008 is particularly unhelpful: on that date, Dr. Lorenz noted that the x-rays of Mr. Firkin's lower back showed that "the fusion looks excellent and is solid. The

hardware is in excellent position. Lordosis is maintained and there is little to no degenerative changes at the level above the fusion." Record at 857.

In short, although there are some records to support Mr. Firkin's disability claim, for the most part, they are dated during the period for which Mr. Firkin has already been awarded benefits. To show that he is entitled to benefits – that he is disabled – beyond that date, he must produce additional evidence to rebut his stipulation that he was no longer disabled as of December 31, 2005. He has not produced such evidence. The evidence covering the relevant period of time – from January 1, 2006 onward – supports the ALJ's decision that Mr. Firkin was not disabled. Because of this, the Court finds that the ALJ's decision was supported by substantial evidence.

It is not clear why the first ALJ entered a closed period of disability – whether it was, as the second ALJ believed, because Mr. Firkin had stipulated that his condition had improved, or for some other reason. But the fact is, he *did* order a closed period of disability, and Mr. Firkin does not seem to have challenged that decision. Certainly, that decision is not before the Court. What is before the Court is the decision issued by the second ALJ, which looked at the period beginning January 1, 2006; for Mr. Firkin to be entitled to benefits for that period, he needed to show that he was disabled after December 31, 2005. And he has

not shown that. In fact, he offered very little in the way of medical records from that period; what he has offered shows that he sought little or no treatment and discontinued his reliance on prescription pain medications, opting instead to rely on over-the-counter medications. The ALJ's decision to deny benefits for the period beginning January 1, 2006 was supported by substantial evidence. Accordingly, the Court affirms the decision of the ALJ; the Commissioner's motion for summary judgment is granted and Mr. Firkin's motion for summary judgment is denied.

## CONCLUSION

For the reasons set forth above, the Court rejects Mr. Firkin's challenges to the ALJ's findings concerning Listing 1.04, his credibility, his RFC and his ability to engage in work existing in the national economy. The Court finds that the ALJ's 2009 decision is supported by substantial evidence and should be affirmed. Accordingly, the Court denies Mr. Firkin's Motion for Summary Judgment [#20] and grants the Commissioner's Motion for Summary Judgment [#23-1].


Dated: April 25, 2012

                        E N T E R:


                        _____
                        ARLANDER KEYS
                        United States Magistrate Judge


32